UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                            :
UNITED STATES OF AMERICA,                   :
                                            :
            -v.-                            :          01 Cr. 21 (GEL)
                                            :
JORGE MANUEL TORRES TEYER,                  :      **OPINION AND ORDER**
a/k/a "Jorge Carlos Moreno," a/k/a "Oso;"   :
VICTOR MANUEL ADAN CARRASCO;                :
and OSCAR MORENO AGUIRRE,                    :
                                            :
                      Defendants.           :
------------------------------------------------------------x

Anirudh Bansal, Assistant United States Attorney,
 New York, NY (Michael J. Garcia, United States
Attorney for the Southern District of New York),
for the United States of America.

Lloyd Epstein, New York, NY, for defendant Jorge
Manuel Torres Teyer.

Paul J. Angioletti, Staten Island, NY, for defendant
Victor Manuel Adan Carrasco.

Robin C. Smith, Brooklyn, NY, for defendant Oscar
Moreno Aguirre.


GERARD E. LYNCH, District Judge:

        Jorge Manuel Torres Teyer ("Torres"), Victor Manuel Adan Carrasco ("Carrasco"), and

Oscar Moreno Aguirre ("Moreno") pled guilty to charges including conspiracy to import cocaine

into the United States, 21 U.S.C. § 963, and use of a firearm during and in relation to a drug

trafficking crime, 18 U.S.C. § 924(c)(1)(A), after having been arrested in Belize in possession of

1500 kilograms of cocaine destined for the U.S. market.  On remand from the Court of Appeals

pursuant to United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), having been sentenced at a

time when the United States Sentencing Guidelines were perceived as mandatory, they seek

resentencing under the principles announced by the Supreme Court in <u>United States v. Booker</u>, 543 U.S. 220 (2005).  The applications of Torres and Carrasco will be denied, since any error in applying the Guidelines as mandatory was harmless, in that the Court can be confident that their sentences would not have been different had they been sentenced under an advisory guidelines regime.  Moreno's application will be granted.

**PROCEDURAL HISTORY**

In late May and early June 2003, Torres, Carrasco and Moreno pled guilty to narcotics conspiracy and firearms charges carrying maximum potential sentences of life imprisonment, and mandatory minimum sentences totaling 15 years in prison.  After an evidentiary hearing, the Court resolved a number of disputed factual and legal issues related to the correct calculation of a sentence under the United States Sentencing Guidelines in a lengthy written opinion.  <u>United States v. Torres Teyer</u>, 322 F. Supp. 2d 359 (S.D.N.Y. 2004).  At the time, it was believed that the Guidelines mandated the sentences to be imposed on the defendants.  Accordingly, finding no reason to depart from the sentencing range provided in the Guidelines, the Court sentenced both Torres and Carrasco within their respective applicable guideline ranges.  On May 4, 2004, Torres was sentenced to a total of 38 years (456 months) in prison, and Carrasco to 22 years (264 months) in prison.  Moreno was sentenced to a total of 17 years (204 months) in prison, which represented an upward departure from the guideline recommendation, which would have directed imposition of the minimum 15-year term, based on a finding that he was a minor participant in the offense.  (For reasons discussed at length in the Court's sentencing opinion, 322 F. Supp.2d at 379-84, and reviewed below, however, the question of Moreno's minor participation was such a close one that the sentence could nearly as accurately have been viewed

2

as a *downward* departure from the minimum sentence of nearly 21 years (248 months) that would have been required had the minor participation reduction not been applied.)

All three defendants appealed.  Between the imposition of the sentence and the resolution of the appeal, the Supreme Court decided both Blakely v. Washington, 542 U.S. 296 (2004), and Booker, 543 U.S. 220, radically altering the proper understanding of the governing sentencing regime, and rendering erroneous this Court's conclusion that imposition of a guidelines sentence was mandatory (apart from the limited departures expressly permitted by the Guidelines).  Thus, although the Court of Appeals affirmed the defendants' convictions and rejected Carrasco's objections to this Court's guidelines rulings, the case was remanded to this Court for proceedings consistent with Booker and Crosby.  See United States v. Magana, 147 Fed. Appx. 200 (2d Cir. 2005).  In other words, this Court was instructed (unless the defendants chose not to seek resentencing) (1) to consider whether the defendants' sentences would have been "nontrivially different" if the Court had correctly applied the Guidelines only as advisory and had imposed sentence in accord with the factors set forth in 18 U.S.C. § 3553(a), and if so, (2) to resentence the defendants under the proper standards.  Crosby, 397 F.3d at 118.

This Court promptly ordered the defendants to advise the Court in writing whether they sought to be resentenced and, if so, to "submit, along with the request for resentencing, any arguments supporting the contention that the sentence imposed would or should have been 'nontrivially different' had sentencing been [conducted] in accord with the principles set forth in § 3553(a) rather than the mandate of § 3553(b), including any additional considerations, not already presented to the Court, which might bear on the sentences to be imposed and that might justify resentencing."  Order of June 21, 2005, at 2.  While Carrasco, represented by counsel,

promptly submitted a letter in support of resentencing, Torres, acting pro se, and Moreno, represented by counsel, requested and received various extensions to the original submission deadline. Moreno submitted an argument for resentencing on March 10, 2006. Torres initially submitted arguments pro se in support of re-sentencing, including submissions both in Spanish and in English. Eventually, however, Torres sought and received appointment of counsel to press his application, and on July 31, 2006, counsel submitted further arguments in support of resentencing. The Government in turn sought additional extensions of time to respond to defendants' applications, as well as to a similar application by co-defendant Oscar Moreno Aguirre. Its response was filed, and the matter finally fully submitted, on November 3, 2006.

Having fully reviewed all submissions of the parties, the Court concludes as to defendants Torres and Carrasco that any error in treating the Guidelines as mandatory was harmless. Their applications for resentencing will therefore be denied. As to defendant Moreno, the Court cannot be confident that the error was harmless. His application will therefore be granted.

## FACTUAL BACKGROUND

The facts are fully set forth in the Court's sentencing opinion and will not be repeated in detail here. A brief summary will suffice.

Two of the three defendants were key figures in a massive international cocaine syndicate. Torres managed an extensive and complex transshipment operation based in Belize, organizing and supervising the transmission of thousands of kilos of cocaine from Colombia, via Belize and Mexico, to the United States. Carrasco handled narcotics shipments and reported to Torres about any problems that arose, and also reported on Torres's activities to leaders of the

cartel.  322 F. Supp. 2d at 363-64, 371-75.   Moreno, as indicated by the minor role adjustment, played a much less significant role, as a foot soldier in the army of workers and armed thugs directed by Torres.

Defendants conceded that the quantity of cocaine involved in their conspiracy placed their offense at the highest base offense level for narcotics crimes under the Guidelines.  Id. at 363.  Indeed, as the Court found after a full evidentiary hearing, "[t]he evidence easily supports a finding that Torres-Teyer's activities involved the importation of 15,000 kilograms, perhaps more – at a minimum, more than 100 times the amount that would justify a base offense level of 38."  Id. at 371.  Torres was an organizer or leader within the operation.  He "quite literally organized the Belizean trans-shipment operation, which itself qualifies as a highly complex criminal activity and a major part of the overall importation scheme.  He did not act as a mere manager or supervisor, but as a high-level operative who recruited, supervised, and directed dozens of individuals and organized their activity."  Id. at 365.

Moreover, the conduct proved at the hearing went far beyond the mere importation of drugs, however vast the quantity.  The conspirators possessed large numbers of firearms, and Torres's own handwritten notes, seized in Belize and placed in evidence at the sentencing hearing

> include[d] orders for the provision of weapons, including machine guns, and chilling instructions to boat captains engaged in drug delivery.  For example, Torres instructed members of the conspiracy that if purported customers did not give the correct password, they should "shoot them all and kill them."  Similarly, if the purported customers did not deliver the appropriate amounts of money, in the right color suitcases, in the right sequence, Torres Teyer instructed his subordinates to "kill them all."

Id. at 371.  Torres personally possessed "a veritable arsenal of weapons at his home," id., and

supervised a virtual private army of gunmen armed with assault rifles to protect the narcotics operation, id. at 371, 381.  In addition, Torres schemed to obstruct justice by corrupting officials in Belize and recruiting his co-defendants to perjure themselves in Belizean criminal proceedings.  Id. at 366-71.

Carrasco was a lesser figure, but still a substantial one, in the conspiracy.  In calculating the guidelines range, the principal issue with respect to Carrasco was whether he should be assessed an enhancement as a manager or supervisor in the organization.  See id. at 373-75. Although the Court did not find that enhancement appropriate, it noted that "[u]nquestionably, Carrasco enjoyed a position of some responsibility in the organization, and Torres Teyer entrusted him with the transfers of cocaine from the Columbian ships to boats destined for Mexico."  Id. at 373.  There was also evidence that Carrasco functioned as a sort of spy sent by the drug cartel's leaders to check up on Torres's management of their interests.  Id. at 375 & n.7. Carrasco carried weapons, including an assault rifle, on trips to meet the cocaine ships, id. at 376, trips on which Torres's orders were to shoot to kill if anything went wrong.  And he was present, along with an armed guard, with the 1500 kilos whose seizure led to the defendants' arrest.  Id. at 373, 378.

Moreno was the armed guard present at that seizure.  Little else is known about his role. The evidence indicated that he was one of the large numbers of "pistoleros and laborers" employed by Torres to carry out functions in the organization.  Id. at 363.

**DISCUSSION**

I.  <u>Torres</u>

The Court's findings and conclusions at the time of sentence make vividly clear that the sentence imposed on Torres would have been the same under the current sentencing regime. First, had the Court imposed its sentence only under the compulsion of the Guidelines, the sentence would surely have been at the low end of the guideline range.  It was not.  The guideline range was 324 to 405 months, to be followed by a mandatory consecutive sentence of 60 months pursuant to 18 U.S.C. § 924(c).  Thus, Torres could have received a sentence as low as 384 months.  Instead, the Court sentenced Torres to a total of 456 months in prison, a full six years more than the minimum sentence recommended (and then believed to be required) by the Guidelines.

Second, the Court's express reasoning, both in the sentencing opinion and in its oral remarks at the time of the sentence, make clear that the Court believed the sentence imposed to be richly deserved for reasons particular to the defendant's circumstances.  The Court considered factors argued by the Government to support an upward departure, principally the sheer volume of drugs and guns involved in the case, which dwarfed the amounts (150 kilograms and one gun) required to trigger the guideline sentence calculated by the Court, and concluded that "[t]hese circumstances clearly justify an upward departure."  322 F. Supp.2d at 372.  Nevertheless, the Court declined in its discretion to depart, because "it need not depart to achieve an appropriate sentence."  <u>Id</u>.  The sentencing range available under the Guidelines permitted the Court to achieve the sentencing result it believed appropriate under the facts of the case.  Moreover, the Court expressly noted that if the offense level were any lower than had been calculated, it would

have departed upward to achieve an appropriate sentence.  Id.

These contemporaneous expressions of the Court's views make clear that the Court did not impose a sentence dictated by a rigid mandatory sentencing scheme, but imposed the sentence it believed was required by justice.  There is no need, in this case, for a hypothetical reconstruction of how this Court would have exercised its discretion in light of the general purposes of sentencing:  The Court actually did exercise that discretion, in setting a sentence within the guideline range, in declining to make a legally permissible departure, and in expressing the view that if the Guidelines had dictated a lower sentence, the Court would have departed upward.

This discretion, of course, was exercised in accordance with the factors set forth in 18 U.S.C. § 3553(a).  Those were the factors that even before Booker were relevant in sentencing within a guideline range, and those are in substance the factors that courts have traditionally followed in determining a just sentence.  An express consideration of those factors both supports the sentence originally imposed and makes even clearer that the Court did consider precisely those factors.

The purposes of sentencing include the need for the sentence "to protect the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(C).  This was a predominant factor in the Court's thinking, and it remains so.  Whatever may be true of other, less powerful or less dangerous, participants in the narcotics trade, the public needs protection from major traffickers in possession of private armies and private arsenals, prepared to exercise deadly violence if necessary to protect their goods.  Sentences must also "reflect the seriousness of the offense, . . . provide just punishment for the offense," id. § 3553(a)(2)(A), and "afford adequate deterrence to

criminal conduct, id. § 3553(a)(2)(B).  The Court specifically referred to these considerations in its sentencing opinion, noting that while a sentence of life imprisonment "would hardly be unjust" in view of the seriousness of the defendant's crimes, a sentence "that will imprison Torres-Teyer for *nearly* his life, until he is well beyond the point of representing a danger to society, will adequately protect the public, deter similar criminals, and punish Torres-Teyer's transgressions."  322 F. Supp. 2d at 373 (emphasis in original).

Moreover, although the Guidelines are no longer mandatory, the recommendation of the Sentencing Commission is also in itself a factor to be taken into consideration.  18 U.S.C. § 3553(a)(4)(A).  The sentence imposed was within the recommended range, and the Court's thinking was structured in accordance with what the Sentencing Commission established as general sentencing policy for the United States.  The Court was also careful to consider "the need to avoid unwarranted sentence disparities."  18 U.S.C. § 3553(a)(6).  This factor often points in the direction of a sentence within the guideline range: Imposing a sentence that is in keeping with recommendations likely to be influential with other judges will avoid idiosyncratic sentencing and thus avoid disparity.  However, avoiding disparity means not only treating like cases alike, but also treating different cases differently.  In sentencing, it is sometimes important to make distinctions among offenders who nominally fall within the same guideline range.  The Court carefully considered this possibility as well, noting that Torres was more culpable than many defendants who would fall within the same guideline range.  As the Court noted, "to sentence Torres-Teyer at the same level as someone who distributed 150 kilograms of cocaine (or, still more astoundingly, a mere 1.5 kilograms of cocaine in the form of crack) would be of highly questionable equity."  322 F. Supp. 2d at 371.  For these reasons, the Court imposed a

9

sentence well above the bottom of the guidelines range.

These factors amply justify the sentence imposed by the Court.  Indeed, as noted above, they would justify a sentence of life without parole.  Nevertheless, the Court also took into account certain specific circumstances of the case to moderate the sentence, cf. 18 U.S.C. § 3553(a)(1) (directing court to consider "nature and circumstances of the offense and the history and characteristics of the defendant" in determining sentence), noting that in view of Torres's guilty plea, "an unparolable life sentence would not serve the interests of justice," and that a sentence that held out to Torres "the hope that he will not die in prison . . .  may serve as an incentive to future guilty pleas and will give Torres-Teyer some credit for his acceptance of responsibility."  322 F. Supp. 2d at 373.

It is thus clear that the sentence the Court imposed was selected in accordance with the purposes of sentencing to be considered under the sentencing regime mandated by Booker and that it fully satisfies those purposes.  The purposes of protecting the public, providing sufficient punishment and deterrence, and avoiding unjust sentencing disparity so strongly support the sentence imposed by the Court that none but the most extreme personal circumstances of the defendant could be expected to mitigate the punishment.  No such mitigating circumstances were presented to the Court at the time of sentencing, although defendant had every incentive to present them to seek a favorable exercise of discretion: The Court's sentencing opinion, which was issued in advance of the sentencing date, sent a clear signal that the Court was considering an extremely severe sentence; the sentencing range calculated in the opinion left open a wide range of potential sentences; and there was always the possibility of a downward departure if there were mitigating circumstances that the Court's sentencing opinion and the Guidelines had

not adequately taken into account.

Nevertheless, as the Second Circuit recognized in Crosby, it is not only sentencing judges, but also defense counsel, who may have been misled by the mandatory sentencing regime.  Perhaps the sentence would have been "nontrivially different" under an advisory regime not because the judge would have weighed the factors differently based on the record then before him or her, but because the record would have been different if the defense had not been discouraged from bringing more information to the Court's attention by the spectre of rigidly mechanical and mandatory Guidelines.  See Crosby, 397 F.3d at 118.  Accordingly, the Court has permitted the defendants to bring to its attention factors that were not placed before it at the time sentence was imposed and has carefully considered their submissions.  Torres makes three separate submissions, two pro se and one through counsel, in support of resentencing.  Each submission will be addressed in turn.

In the first pro se submission, written in English (presumably by or with the assistance of a fellow inmate), Torres makes a number of points that have little or no bearing on the factors relevant to whether resentencing is appropriate under Booker and Crosby, and instead reargues guideline application issues already decided by the Court, or asserts various purported violations of his rights.

(a) Torres reiterates objections to the Court's application of an obstruction of justice enhancement to his sentence, U.S.S.G. § 3C1.1, arguing (1) that the enhancement does not apply because he was not aware of, and thus could not have intended to obstruct, his projected prosecution in the United States; (2) that testimony of Magistrate Herbert Lord refutes the evidence that he attempted to bribe the Belizean magistrate; and (3) that the enhancement was

11

based on testimonial hearsay from a Belizean prison official in violation of the confrontation

clause of the Sixth Amendment as interpreted in Crawford v. Washington, 541 U.S. 36 (2004).

(Mot. Re-sent. at 6-7.)  But (1) there was specific evidence in the record, cited by the Court in its

sentencing opinion, reflecting Torres's concern with prosecution in the United States, 322 F.

Supp.2d at 366-67; (2) the Court found that the evidence established a *conspiracy* to obstruct

justice by bribing Magistrate Lord, specifically noting the magistrate's testimony that no bribe

had actually been paid, id.; and (3) the evidence of this conspiracy relied on by the Court was not

hearsay (indeed, the Court expressly declined to rely on alleged schemes that were supported

only by hearsay evidence, id. at 369-71), but consisted of direct testimony from Torres's

henchman Liston McCord and notes written by Torres himself.  Id. at 366-67.  Torres submits no

new evidence, let alone any material that was not equally relevant under the mandatory

guidelines regime.

(b) Torres next argues that he was unlawfully kidnaped and taken to the United States in

violation of the extradition treaty with Belize and that his lawyer was ineffective for failing to

raise that point.  As Torres's own submission shows, he was not "kidnaped," but rather expelled

from Belize.  (Mot. Re-sent. at 8.)  But even if Torres had been kidnaped in violation of local

and international law, the Government's conduct was not so "shocking," "outrageous," or

"flagrant," as to defeat the Court's jurisdiction or otherwise prevent his conviction.  United

States v. Romano, 706 F.2d 370, 372-74 (2d Cir. 1983) (noting that while certain extreme

misconduct in producing defendant may require court to divest itself of jurisdiction,

government's methods, even when irregular or improper, do not normally offend due process or

render conviction infirm).  And Torres does not explain how any violation of his rights under

Belizean or international law could mitigate his guilt or relate to the purposes of sentencing set forth in § 3553(a) or, even if it somehow did, how any such mitigation could outweigh the reasons underlying the sentence imposed by the Court described above.  The same is true of the Government's alleged violations of the Vienna Convention (Mot. Re-sent. at 13); any such violation, even if proved, has no bearing on the considerations relevant to sentencing.

(c) Torres argues that the Government misled the Court by withholding evidence of the lack of credibility of a witness incarcerated in Mexico, whose affidavit was presented by the Government.  (Mot. Re-sent. at 13-14.)  However, the Court's sentencing decision placed no reliance whatsoever on this purported witness; indeed, his testimony is not even obliquely referred to in either the Court's sentencing opinion or in the transcript of the sentencing proceeding, and was completely disregarded by the Court.

(d) The only argument in the English submission potentially bearing on the appropriateness of Torres's sentence is the claim that the American visas of certain of his family members have been revoked, preventing them from visiting him in prison. (Mot. Re-sent. at 14-16.)  Undoubtedly, being cut off from contact with loved ones would increase the suffering that accompanies imprisonment, and is therefore relevant to the severity of the sentence imposed. However, Torres provides no sworn statement or other admissible evidence attesting to the revocation of the visas involved.  Indeed, from the unsworn allegations in Torres's pro se submission, it is not even clear how many relatives are involved.  Moreover, there is no indication that this visa revocation had occurred by the time of the sentence; if anything, Torres's papers imply that this is a recent development.  To the extent Torres complains of something that has occurred since sentence was imposed, the complaint is irrelevant to the issue before the

13

Court.  The sentence imposed could not have been affected, with or without <u>Booker</u>, by events that occurred after sentence and entry of judgment.  See <u>Crosby</u>, 397 F.3d at 117 (noting that question is whether post-<u>Booker</u> sentence would have been nontrivially different "under the circumstances existing at the time of the original sentence").  Most importantly, however, even if the issue had been brought to the Court's attention at the time of sentencing, it would not have had any effect.  The Court was fully aware that Torres would be incarcerated in the United States, which is not his native country and where he has never lived or worked.  Visits from family necessarily would be few and far between.  That hardship was taken into account, but the compelling need for a sentence adequately protective of the public and commensurate with Torres's desert outweighed it, and continues to outweigh it.

(e) Torres contends that his guilty plea to the firearms offense was unintelligent, apparently because he was improperly coerced to take the plea by his trial counsel.  This argument is irrelevant to the sentencing issues before the Court at this time.  The proper vehicle for challenging a prisoner's conviction is a petition pursuant to 28 U.S.C. § 2255.  Because of the substantial obstacles to pursuing a second such petition after a first has been denied, <u>see</u> 28 U.S.C. §§ 2255 and 2244, the Court of Appeals has cautioned against construing prisoner petitions submitted under other rubrics as § 2255 petitions without affording petitioners an opportunity to decide for themselves whether such a petition should be filed.  <u>Adams v. United States</u>, 155 F.3d 582 (2d Cir. 1998).  Accordingly, the Court at this point simply notes that Torres's attack on his plea is not germane to the present issue, and it will reserve consideration of arguments about the validity of his conviction until such time, if ever, as Torres elects to submit such a petition.

Torres's second pro se sentencing document, handwritten and in Spanish, presents a completely different issue.  In that submission, Torres argues that his sentence should have taken into account his alleged efforts to cooperate with the U.S. authorities shortly after his arrest. Before <u>Booker</u>, the law was clear that a departure from a Guidelines sentence based on the provision of assistance to law enforcement authorities could only be made on the motion of the Government.  U.S.S.G. § 5K1.1.  The Court had no power to question the Government's failure to make such a motion  except in the unusual circumstance in which the failure was motivated by an unconstitutional bias, <u>United States v. Morgan</u>, 386 F.3d 376, 382-83 (2d Cir. 2004), or the Government violated the obligation of good faith and fair dealing implied by the parties' plea agreement, <u>United States v. Brown</u>, 321 F.3d 347, 354 (2d Cir. 2003).

The situation may be different after <u>Booker</u>.  If the Guidelines sentence is not mandatory, and the Court must take into account any of the "history and characteristics of the defendant" that bear on the relevant purposes of sentencing, 18 U.S.C. § 3553(a)(1), such efforts at cooperation may be relevant to sentencing, with or without a Government motion, to the extent they might bear on the defendant's character and future dangerousness.

It is important, however, to understand the possible bearing such efforts may have on the purposes of sentencing, and the limited role of the Court in second-guessing the Government's decisions about cooperation.  There are two distinct rationales for considering cooperation in sentencing.  One rationale is strictly utilitarian; a critic might even find it coldly cynical.  From this perspective, the purpose of reducing a cooperator's sentence is to benefit society by furthering law enforcement. Considerations of justice come into play only to the limited extent allowed by cases like <u>Morgan</u> and <u>Brown</u> under the mandatory Guidelines regime: the

Government may not withhold the benefits of cooperation based on unconstitutional motivations such as racial prejudice, and it must fulfill its bargains in good faith.  No matter how horrible an offender's crimes, how unlikely his prospect of rehabilitation, how dangerous he might be, an informer deserves a reward for the benefit conferred on society by his assistance in investigating and prosecuting wrongdoers.  To the extent that a sentence reduction represents simply a price paid for a benefit conferred, it has little to do with the ordinary purposes of sentencing, and everything to do with a specific policy recognized by the Congress and the Sentencing Commission in 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1.  Law enforcement authorities are in the best position to assess whether that benefit was extensive enough to warrant a reward. Judges are ill-placed to assess whether a defendant's self-proclaimed "cooperation" was truthful, whether it was of any value, or whether law enforcement priorities otherwise justified a decision not to make use of the proffered services of the would-be cooperator.  Since the purpose is to further law enforcement's effort to investigate and prosecute criminals, the executive branch, which has the responsibility and expertise for carrying out those goals, and not the judiciary, is in the best position to assess whether a reward for cooperation is in order.

        The second reason for recognizing cooperation, however, fits more closely within the purposes of sentencing that must be taken into account under section § 3553(a).  To the extent that a decision to cooperate with the authorities represents an expression of genuine remorse, and a decision to make amends to society and cut one's ties to the criminal underworld, it may indicate that the defendant's character is less incorrigible than it may have otherwise appeared, and that the need for protection of the public – a critical goal of sentencing under § 3553(a)(2)(C) – is to some extent reduced.  If the effort to assist the authorities comes to nought,

16

the defendant is not entitled to a reward, but even if his cooperation leads to no tangible benefit, it may still be relevant to an assessment of his character and his future dangerousness. That assessment is expressly the responsibility of the sentencing court under § 3553(a).

Applying this framework to Torres, it is clear that he is entitled to no reward. The Government decided not to enlist him as an informant. It has filed no motion seeking a sentence reduction. Torres's own submission includes a statement from one of his former attorneys indicating that the Government rejected his efforts to cooperate because he was falsely underestimating his own culpability and attempting to protect other culpable individuals. (Nalven Decl. ¶ 4.) To whatever extent (if any) a court may be authorized to assess such conclusions in a post-Booker regime, for the reasons stated above this Court must accord extraordinary deference to law enforcement authorities in exercising any discretion it may have. In any event, Torres provides no evidence whatsoever that would warrant second-guessing the Government's determination that his effort to cooperate was ultimately of no benefit to law enforcement. To the extent that Torres argues that the Government acted in bad faith or out of unconstitutional malice in rejecting his cooperation efforts, such arguments could and should have been raised even under the mandatory guideline regime; such arguments therefore do not bear on the question whether the mandatory application of the Guidelines prejudiced Torres. Torres presents no cogent or compelling reason to excuse his failure to raise such arguments at the time of the original sentence, nor does he claim that his sentencing counsel was ineffective for failing to do so. See United States v. Quintieri, 306 F.3d 1217, 1229-31 (2d Cir. 2002).

To the extent that Torres argues that his efforts at cooperation show a change of heart or character that should be taken into account in assessing how long a sentence is "sufficient, but

not greater than necessary" to accomplish the purposes of sentencing, 18 U.S.C. § 3553(a), that

is a consideration that could not have been addressed under the pre-Booker mandatory

sentencing regime, but that could be taken into account today.  The Court is confident, however,

that the materials now proffered by Torres (or which Torres requests the Court to procure) could

not conceivably have affected the sentence if they had been brought to the Court's attention at

the time of sentence, and if the Court had considered them under the principles announced in

Booker.

There is no evidence whatsoever that Torres's efforts to "cooperate" reflect a change in

the cynical, violent, criminal character that brought him before the Court.  As he himself notes,

he began his "attempts to cooperate" very soon after his arrest.  (Nalven Decl. ¶ 3.)  Torres's

contemporaneous conduct demonstrates that far from representing a change of heart, his

purported cooperation effort was simply one strategy to avoid punishment.  While detained,

Torres simultaneously or sequentially tried both cooperation and corruption as equally attractive

tactics for reducing his time in prison, engaging in a variety of additional criminal schemes.  322

F. Supp.2d at 366-71.  Moreover, as noted above, even after his expulsion to the United States,

his efforts at cooperation were rejected by the Government as half-hearted, self-protective and

dishonest.  (Nalven Decl. ¶ 4.)  There was thus no reason at the time of sentence, and there is no

reason now, to take the minimal showing of a self-serving stab at cooperation as evidence

bearing favorably on Torres's character.

Finally, in yet a third sentencing submission, Torres argues through counsel that "the

Court's sentencing opinion suggests that the Court would have imposed a lesser sentence had it

not felt bound by the Guidelines."  (Letter of Lloyd Epstein, Esq., to the Court, dated July 31,

2006, at 1.)  This assertion, which as already fully explained is completely inconsistent with the

Court's analysis both in its sentencing opinion and in its remarks at the time of sentence, is based

on the facts that the Court's finding that an organizer/leader enhancement applied was compelled

by case law and by the language of the Guidelines, and that the ultimate sentence was "largely

driven by the sheer quantity of drugs" that Torres was responsible for importing.  (Id., citing 322

F. Supp.2d at 363-64, 371.)

      This argument misconceives both the Court's opinion and the role of the Guidelines in

post-Booker sentencing.  As the Court of Appeals made clear in Crosby, accurately calculating

the recommended guideline sentencing range remains the first step in determining an appropriate

sentence.  397 F.3d at 112.  Thus, the Court's guideline calculation today would be determined

by the same considerations, including the organizer/leader enhancement, as it was when the

sentencing opinion was written.  That the application of the enhancement was "compelled"

(Epstein Letter at 1) by the language of the Guidelines and by the governing precedent

interpreting it – in other words, that the application was correct – does not mean that the

sentence imposed by the Court was compelled by an inaccurate understanding of the Court's

discretion.  Similarly, where a defendant like Torres plays a major leadership role in importing

thousands of kilos of cocaine into the United States, it was and remains entirely appropriate that

the "sheer quantity of drugs" plays a major role both in calculating the guideline

recommendation and in imposing sentence.  This is not a case in which the technical guideline

calculation turns on a cumulation of small sales or in which a low-level conspirator is held

responsible for sales he could only barely foresee.  In such cases the relationship between the

quantity of drugs attributable to the defendant and the defendant's actual culpability might be

tenuous, and it might therefore  be appropriate for a court with discretion to impose a lower sentence than that recommended by the Guidelines.  In this case, the relation between the size of the conspiracy and Torres's culpability is direct.

At sentencing, the Court told Torres that he was "far more culpable than any narcotics defendant I have ever sentenced." (5/4/04 Tr. 14.)  Absolutely nothing in any of Torres's submissions gives the Court any reason to think that its sentence would have been "nontrivially different," or indeed different at all, if Torres had been sentenced under a proper understanding of the Guidelines as advisory.

II.  Carrasco

Like Torres, Carrasco was not sentenced at the bottom of the applicable guideline range. He was sentenced almost exactly in the middle of the range, demonstrating that his sentence was not compelled by the mandatory guideline regime, but rather was selected by the Court as the individually appropriate sentence.  Also like Torres, Carrasco was sentenced within the guidelines range notwithstanding the presence of what the Court recognized as a "permissible" ground for an upward departure, because the Court believed his punishment would "adequately" to accomplish the goals of sentencing without such a departure (or, indeed, without an increase above the middle of the applicable sentencing range).  322 F.Supp.2d at 377.  In short, Carrasco's sentence was the product of careful deliberation and the exercise of discretion in light of the purposes of sentencing as applied to the facts of his case.

Finally, also as with Torres, the Court expressly based its sentence on factors set forth in § 3553(a), including the need for punishment, deterrence, and protection of the public in light of the seriousness of the conduct involved.  At the sentencing proceeding, the Court focused on the

seriousness of the offense, telling Carrasco that "the fact that you carried guns and you were in a position that might have required you to carry out Mr. Torres's violent orders . . . . warrants a long sentence." (5/4/04 Tr. 21-22.) The Court also focused, as with Torres, on the need to avoid disparate sentencing. Noting that Carrasco's sentence, like his role, was less than that of Torres, the Court pointed out that it was "more in keeping with that of others who have been sentenced for their roles in large-scale drug distribution organizations." (Id. 21.) Thus, although imposed before Booker, the Court's sentence was based directly on the very factors set forth in § 3553(a) that Booker commands courts to address today.

Carrasco's argument for resentencing also reiterates arguments that were made and rejected at the time of the sentencing and that would not have resulted in a lower sentence regardless of whether the Guidelines were treated as mandatory or advisory. Carrasco argues that he was a mere "factotum," that he did not profit greatly from the conspiracy, that he was not a leader, and that his actual or hoped-for involvement in the plan to obstruct justice by exonerating Torres by taking the punishment himself (in exchange for relatively modest payments) shows that he was "expendable." (Letter of Paul J. Angioletti, Esq., to the Court, dated July 27, 2005 at 5-6.) All of these arguments are quite appropriately made under Booker and § 3553(a). They were also appropriate arguments to make under the mandatory guideline regime, and were made at the time of sentencing. (See, e.g., 5/4/04 Tr. 18.) They did not succeed in persuading the Court to lower the sentence to the bottom of the mandatory guideline range, and they therefore could not have succeeded in persuading the Court to impose a sentence even lower than the guidelines recommendation.

21

Also like Torres, Carrasco devotes a great deal of his submission to making incorrect legal arguments, rather than addressing factors relevant to consideration or advocacy of a sentencing as under an advisory regime.  Carrasco argues that his sentence was unconstitutional, because the Court found facts by a preponderance of the evidence.  (Angioletti Letter at 7-9.) But as the Second Circuit made clear in Crosby, this is precisely what the Court would do if resentencing were required under Booker.  397 F.3d at 115.  See also United States v. Vaughn, 430 F.3d 518, 526 (2d Cir. 2005); United States v. Garcia, 413 F.3d 201, 220 n.15 (2d Cir. 2005) Under the "new" regime of Booker, the Court is required first to calculate the guidelines recommendation, finding the necessary facts by a preponderance of the evidence, just as it did before Booker, in order to understand the correct guidelines recommendation, which must then be "considered," along with the other factors in § 3553(a).  Thus, any arguable "error" in this context would not be that the Court in imposing the original sentence found facts by a preponderance of the evidence, but that it used those facts to impose a mandated guideline sentence.  What has changed since Booker is not the procedure used to find facts relevant to a guideline calculation, but the weight of the resulting guideline, which is now not mandatory but advisory.

Carrasco does appropriately argue that his sentence is too severe because his lack of a prior criminal record, his limited profit from the crime, and his record of legitimate employment cast a positive light on his prospects for rehabilitation.  (Angioletti letter at 9.)  These are indeed factors that could not have supported a below-guidelines sentence under the mandatory guidelines regime, but that could do so today.

But those facts do not persuade the Court that a sentence below the guidelines range should be imposed, any more than they persuaded the Court to exercise its discretion to impose a lower sentence within the guidelines range.  Carrasco played a major role, not merely as a "*pistolero*," as he would now have it (Angioletti letter at 9) – although he did carry weapons in contexts where his orders called for him to commit murder, hardly a mitigating circumstance – but as a significant functionary in Torres's organization, and perhaps as a spy from above. Indeed, on appeal Carrasco "acknowledge[d] that he was the supervisor of the cartel's security crew."  147 Fed. Appx. at 200 (internal quotation marks omitted).  Unlike the mere workers in the organization, he was not recruited locally to perform simple menial or violent tasks, but traveled from Mexico to Belize on the instructions of the organization to act as Torres's trusted colleague.  He did this as part of an armed, violent organization that was responsible for the export to the United States of truly vast quantities of cocaine.

Carrasco points to no facts that were not brought to the Court's attention when the Court elected to impose a sentence in the middle of the recommended guideline range, and he presents no persuasive argument that his sentence, which was above the minimum believed to be required by the Guidelines, would have been different had the Court enjoyed greater discretion. Nothing in the record then or now persuades the Court that its sentence would have been "nontrivially different" had sentence been imposed under Booker.

III.  Moreno

Moreno's situation is distinguishable from that of his co-defendants, and it presents a much closer question.  First, unlike Torres and Carrasco, whose sentences were within their respective guidelines ranges, Moreno's sentence represented a departure from the applicable

guidelines sentence.  Although technically an upward departure, the sentence was in fact the product of an anomaly in the version of the Guidelines applicable at the time of his offenses.  At that time, as explained at length in the Court's sentencing opinion, the Guidelines created a dramatic sentencing "cliff," in cases involving very large amounts of narcotics, between the base sentence for ordinary and for minor participants in drug conspiracies.  322 F. Supp.2d at 380-81. In Moreno's case, had he not been determined to be a minor participant, the Guidelines would have required a sentence totaling 248 months in prison.  Because he was found to be a minor participant, however, his sentence dropped to a level well below the mandatory minimum sentence of 180 months.  Determining whether Moreno fell within one category or the other was a close and difficult question.  Id. at 379-82.  Neither sentencing range appeared clearly correct: sentencing Moreno as a minor participant would ignore the unusually broad scope of the conspiracy in which he was a member, and the potential violence implicit in his role; sentencing him as anything other than a minor participant would effectively treat him as a major trafficker, rather than as a low-level employee of such an offender.  Ultimately, the Court found him to be a minor participant but departed upward from the sentence applicable to such an offender, while noting at the same time that an almost equally compelling case could be made for denying the adjustment for minor role and then departing downward to the same place.  Id. at 383-84.

Second, unlike his co-defendants, Moreno submits additional information that was not available to the Court at the time of the initial sentence, in the form of a report from a forensic psychologist finding that Moreno suffers from mental retardation and depression, likely present at the time of his offenses, that might justify a departure for diminished capacity, and that in any event would be relevant "characteristics of the defendant," 18 U.S.C. § 3553(a)(1), that are

relevant to a determination of the defendant's sentence in exercising the discretion now provided under the post-<u>Booker</u> understanding of § 3553(a).  (Letter of Robin C. Smith, Esq., to the Court, dated March 10, 2006, at 5-7, and attachment.)

The first of these distinctions for the most part cuts against Moreno's argument.  The sentence imposed in his case was an unusual one, representing anything but a rote application of a mechanical guideline system; rather, it represented a careful balancing of the factors bearing on a just sentence that were in the record at the time of the sentencing.  If the question posed by Moreno today were limited to whether the sentence would have been different *on the same record*, but under an advisory Guidelines regime, the answer would have to be that it would not, because the Court did not in fact follow the Guidelines.  Instead, the Court imposed the sentence that appeared to be correct given the particular circumstances at the time.

The second distinction, however, cuts the other way.  As noted above, a sentence might be different under an advisory guidelines regime not only because the judge might weigh the record differently, but because the record itself might have differed if *counsel* had understood the extent of the Court's available discretion.  The Government points out that Moreno's alleged mental retardation might have been advanced even under the mandatory guidelines regime in support of a downward departure for diminished capacity.  (Letter of AUSA Anirudh Bansal to the Court, dated Nov. 3, 2006, at 13 n.1.)  Moreover, Moreno *did* argue, and the Court took into account in calculating his sentence, that he was an unsophisticated farmer with a very limited, non-intellectual role in the offense.  322 F. Supp.2d at 381.  At the same time, however, the mandatory guidelines regime operated to deflect defense counsel from emphasizing factors about their client's background that might explain their behavior.  Such traditional sentencing factors

based on individual characteristics played such a limited role in the pre-Booker sentencing system that defense counsel can hardly be faulted for concentrating their attention on other issues, and not fully exploring factors that, even if potentially relevant to long-shot departure arguments, no longer appeared to carry weight with the courts under the rigid sentencing rules then understood to govern their clients' fates.  It therefore is appropriate to assess whether the psychologist's report now submitted to the Court would have made a difference to the outcome if the Court had recognized the unconstitutionality of applying the Guidelines as a mandatory sentencing system.

Though the issue is a close one, the Court cannot rule as a matter of law that the information now proferred would not have made a difference.  The Court was aware that Moreno was a simple man.  But there is a difference between a lack of sophistication and mental retardation.  As the Supreme Court recognized in Atkins v. Virginia, 536 U.S. 304 (2002), lack of normal intelligence is a mitigating circumstance that can bear significantly on culpability. Although the Court noted a number of factors that argued against imposing only the mandatory minimum sentence (5/4/04 Tr. 32), those factors might have weighed differently had the Court had before it evidence of such a significant potential mitigator.  Indeed, the Second Circuit has noted that even where a sentencing court correctly rejected a diminished-capacity departure before Booker, evidence of retardation could still affect the sentence under the post-Booker regime.  United States v. Vargas, 426 F.3d 178 (2d Cir. 2005).  Moreover, it is difficult to be certain whether the pernicious effects of a rigid and draconian guideline system might have influenced the Court even in calculating a sentence that was expressly understood to be a departure from the applicable norms.  The Court therefore cannot rule out the possibility that the

26

general misunderstanding of the legal force of the Guidelines had a harmful effect on the outcome of this defendant's case.  Under the terms of the Crosby remand, therefore, Moreno must be resentenced.

That resentencing is required does not necessarily imply that the sentence ultimately given will be different than the one previously impoased.  Moreno's submission presents new evidence, in the form of a psychological report, the credibility of which has not yet been tested. The Government will have the opportunity, upon resentencing, not only to argue the extent to which Moreno's mental retardation, if proved, should affect his sentence, but also to present (if it wishes) its own expert testimony challenging Moreno's expert's conclusions.  Moreno's intelligence was assessed by giving tests not standardized for persons from his cultural background and which were administered to him through an interpreter.  It is not clear what effect such factors might have had on his performance, and whether the diagnosis provided could be challenged on that basis.  These and other issues need to be explored on a fuller record, and such a record may or may not justify a lower sentence.

Moreno was sentenced to 17 years in prison, and the statutory mandatory minimum sentence, irreducible whatever the extent of the Court's discretion to impose a non-guidelines sentence, is 15 years.  The difference may appear small, relative to the length of the sentence Moreno must serve in any event.  But two years of a man's liberty is no minor matter.  The possibility that the Court might have imposed a lower sentence had the Guidelines not been perceived as mandatory by the Court and all counsel warrants the additional effort of resentencing.

27

## CONCLUSION

Because the sentences of Torres and Carrasco would not have been "nontrivially different" had the correct standards been applied, any error in sentencing defendants under the mandatory Guidelines regime was harmless.  Accordingly, their requests for resentencing are denied.

Because it is not certain that Moreno would have received the same sentence under a non-mandatory guideline sentencing system, the judgment in his case is vacated, and he will be resentenced on a date to be determined in consultation with counsel.


SO ORDERED.

Dated: New York, New York
      December 6, 2006

GERARD E. LYNCH
United States District Judge

28